JOE WATTS MARTIN AND ROSE PUGH MARTIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Martin v. Commissioner
Docket No. 16242-81.
United States Tax Court
T.C. Memo 1987-170; 1987 Tax Ct. Memo LEXIS 166; 53 T.C.M. (CCH) 486; T.C.M. (RIA) 87170; March 30, 1987. C. Everette Boutwell, for the petitioners. Robert W. West, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax under section 6653(b)[1] for the years and in the amounts as follows: Year Ended
Income
Addition to Tax
Dec. 31
Tax
Sec. 6653(b)
1970
$12,412.90
$6,206.45
1971
10,185.63
5,092.82
1972
32,563.46
16,281.73
1973
11,847.12
5,923.56
1974
27,535.15
13,767.58
1975
44,159.34
22,079.67
At the conclusion of the trial respondent conceded that he had not shown fraud on the part of Mrs. Martin and on brief petitioners conceded that respondent's net worth determination with an agreed adjustment for additional state sales tax correctly reflects petitioners' taxable income for the years here involved. These concessions leave for our decision (1) whether assessment of additional tax for each of the years here in issue is barred by the statute of limitations, (2) whether any part of *168 the underpayment of tax for each of the years here in issue is due to fraud with intent to evade tax on the part of Joe Watts Martin under section 6653(b), (3) if it is held that the returns for the years 1974 and 1975 were not fraudulent so as to remove the bar of the statute of limitations provided for by section 6501(a), was there an omission of more than 25 percent of gross income for each of the years 1974 and 1975 within the meaning of section 6501(e), and (4) whether petitioner Rose Pugh Martin is entitled to be relieved from the deficiencies in tax in each of the years here in issue as an innocent spouse under the provisions of section 6013(e)(1). FINDINGS OF FACT Petitioners, husband and wife, who resided in Pascagoula, Mississippi, at the time the petition in this case was filed, filed joint Federal income tax returns for each of the calendar years 1970, 1971, 1972, 1973, 1974, and 1975. Petitioners filed amended Federal income tax returns for the calendar years 1973, 1974, and 1975. During the taxable years here involved, petitioners operated a business under the name of Pugh's Floral Shop as equal partners. Petitioners began their floral business as a partnership *169 in 1945 with $1,000 which Mrs. Martin had received as a gift from her parents. In 1969 the Engles Shipbuilding Yard reopened in Pascagoula, Mississippi, and began employing approximately 20,000 people. The increase in population of Pascagoula and the increase in jobs available because of the opening of the Engles Shipbuilding Yard coincided with an increase in petitioners' sales in their florist business. Petitioner Joe Watts Martin left high school in the eleventh grade and entered the Merchant Marines. Thereafter he worked at several different types of jobs until he and his wife opened the floral business in 1945. Mrs. Martin was a college graduate and after her marriage to Mr. Martin in 1934 taught Latin in high school for a number of years. When the floral business opened, and continuing thereafter, she worked actively in the business. Petitioners had seven children, the oldest born in 1935 and the youngest in 1953. Mr. Martin did most of the record keeping of the florist shop, but Mrs. Martin worked on the files involving charge sales, posting the account when payment was made. These files were referred to by petitioners as the A to Z files. Petitioners did not keep *170 a formal set of books for their floral business. The records they maintained included their bank statements, canceled checks, deposit slips, some payroll records, some receipts for bills paid, and boxes of sales tickets. Charge tickets reflecting accounts receivable were arranged alphabetically in an index file (the A to Z files). Petitioners' records also included statements received with respect to Florist Trans-World Delivery (FTD) sales. Petitioners' records were not arranged in any orderly manner. During the years here in issue, both petitioners had some medical problems. Mr. Martin had several hernia operations and also a problem with his eyes, and Mrs. Martin suffered from arthritis. During the years here in issue petitioners had no bookkeepers assisting them in their floral business, although in prior years they did on at least two occasions temporarily employ a bookkeeper. Three of petitioners' sons worked in the business during the years here in issue. Petitioners' sons would at times make out sales tickets and at times assist Mrs. Martin with the A to Z files, as well as sell flowers. Mr. and Mrs. Martin did most of the floral design. In addition to their three *171 sons, petitioners at times had part-time help with the selling and school boys on a part-time basis for delivery boys. Mr. Martin at the end of each year would enter figures on sheets of paper and take these figures to the return preparer who had prepared their returns for a number of years prior to the years here in issue. The return preparer would enter the figures furnished her by Mr. Martin on the Forms 1065, Partnership Returns of Income, and on petitioners' Federal income tax returns filed in each of these years. The original 1065 forms filed by petitioners for their partnership business which were prepared by the return preparer from figures furnished to her by Mr. Martin show the following for the years indicated: 1970
1971
1972
1973
1974
1975
Gross
Receipts
$54,431.09
$64,686.70
$75,160.11
$95,161.47
$113,582.88
$139,329.57
Less: Cost of
Goods Sold
19,532.98
22,317.25
24,669.77
34,273.43
38,479.35
47,818.22
Gross
Profit
34,898.11
42,369.45
50,490.34
60,888.04
75,103.53
91,511.35
Total
Deductions
28,467.90
30,695.75
38,470.28
52,958.21
67,630.07
77,868.81
Ordinary
Income
6,430.21
11,673.70
12,020.06
7,929.83
7,473.46
13,642.54
*172 Included in the total deductions for the years here involved were $14,390.55 for salaries and wages for 1970, $13,260.00 for salaries and wages for 1971, $18,585.00 for salaries and wages for 1972, $30,838.38 for salaries and wages for 1973, $42,609.99 for salaries and wages for 1974, and $47,281.53 for salaries and wages for 1975. On each of the Forms 1065, the ordinary income is shown as equally divisable between Mr. and Mrs. Martin. On their joint income tax returns filed for each of the years here in issue, petitioners showed the following sources of income and adjusted gross income: 1970
1971
1972
1973
1974
1975
Interest Income
$1,328.97
$2,403.07
$5,218.55
$5,900.76
$10,130.09
$15,723.62
Income other
than Wages,
Dividends &
Interest
6,430.21
11,673.70
* 12,020.06
7,929.83
7,473.46
13,642.54
Adjusted Gross
Income
7,759.18
14,076.77
17,238.61
13,830.59
17,603.55
29,366.16
Petitioners during the years here in issue had no income from any source other than their interest income and income from their floral business. The work sheets supplied by Mr. Martin to the *173 return preparer did not contain all of the information necessary to file proper returns for the partnership and petitioners for the years here in issue. The work sheets showed gross receipts and items of expenses for each year. The amount of gross receipts supplied by Mr. Martin to the return preparer were not prepared from any records of the business, but were estimated by Mr. Martin. Pugh's Floral Shop received payments for sales of goods and services in cash, by check, and by charge account, including charge cards. Petitioners did not deposit all of the receipts of Pugh's Floral Shop into bank accounts during the years here in issue. Some of the amounts not deposited were used for business expenses and some of the amounts were used for personal expenses. During 1976, the Mississippi State Tax Commission performed a sales tax audit of petitioners' floral shop. The sales tax audit was for a portion of 1973 and all of 1974 and 1975. The audit resulted in additional sales tax being paid by petitioners to the state of Mississippi for 1973 of $4,043.23, for 1974 of $6,529.84, and for 1975 of $7,144.54. In conducting the sales tax audit, the state examiner determined gross sales *174 from total bank deposits using bank statements and deposit slips and from FTD statements. After his audit, the Mississippi state examiner suggested to Mr. Martin that he file amended partnership returns and income tax returns for the years 1973, 1974, and 1975. Petitioner filed amended partnership returns for each of these years reporting the following: 1973
1974
1975
Gross Receipts
$231,129.64
$256,388.95
$296,332.87
Less Cost of
Goods Sold
159,317.32
167,270.47
176,896.32
Gross Profit
71,812.32
89,118.48
119,436.55
Total Deductions
64,219.58
84,399.63
93,809.87
Ordinary Income
7,592.74
4,718.85
25,626.68
The amounts for salaries and wages included in total deductions were the same as the amounts shown on the original partnership returns for each of the years 1973, 1974 and 1975. The amended joint Federal income tax returns filed by petitioners for the years 1973 and 1974 showed a decrease in income of $337.09 and $2,754.61, respectively. The decreases were explained as resulting from errors in computing profit for the partnership returns. Petitioners' amended joint Federal income tax return for 1975 showed an increase in reported *175 income of $11,984.14 with corrected 1975 income being shown as $41,350.30, with the explanation that the change resulted from an error in computing partnership income. The amended joint returns filed by petitioners were based on interest income as previously reported and the revised figures from the amended Forms 1065, Partnership Returns of Income. The gross receipts used in the amended partnership returns of income were the figures compiled by the state tax examiner. The total deposits to petitioners' business bank accounts at the Pascagoula Moss Point Bank and the Merchants and Marine Bank were $161,641 for 1971, $192,460 for 1972, $232,994 for 1973, $256,633 for 1974, and $295,292 for 1975. All of the salaries paid by petitioners to their employees during the years here in issue were paid in cash. Salaries were paid to petitioners' three sons who worked in the business and the part-time persons who worked there. Also during the years here in issue, petitioners paid several specific suppliers in cash on a regular basis. Petitioners paid Baldwin Wholesale Florist approximately $15,000 per year in cash and paid Youngstown Wholesale Florist approximately $5,000 a year in cash. *176 Petitioners also paid cash for plants from some of their suppliers of plants. When a shipment of flowers arrived at the bus station, petitioners would always pay the shipping cost in cash since the bus station would not accept a check for payment. Petitioners also paid their life insurance premiums in cash and made donations to their church in cash. When petitioners received a business check which they thought might be questionable, they would negotiate the check for cash and use the proceeds to pay personal or business expenses. These checks were not deposited in a business bank account. Petitioners had receipts for some of the cash payments made for merchandise and also had some payroll records, but they were not in such order as to enable anyone to ascertain if they were complete. During the years here in issue, in addition to paying certain personal expenses and business expenses with cash that was never deposited in their checking accounts, petitioners also paid living expenses by check from the partnership checking accounts at the Pascagoula Moss Point Bank and the Merchants and Marine Bank. Petitioners identified some, but not all, of their personal checks by writing *177 the letters "Prop" on the checks. At various times during the years 1969 through 1975, petitioners maintained savings accounts at the Bankers Trust Savings and Loan Association, First Federal Savings and Loan Association, Pine Belt Savings and Loan Association, and Twin Cities Savings and Loan Association. Some of the savings accounts were in the joint names of petitioners and were held in joint ownership. Because of Mrs. Martin's arthritic condition, Mr. Martin handled most of the deposits, withdrawals, and renewals to the savings accounts. Mrs. Martin was aware of the savings accounts and signed the signature cards required by the savings and loan associations for the creation of the savings accounts. The following table shows the yearly increases in the savings accounts maintained by petitioners, including the amounts from reinvested interest: Year
Amount
1970
$ 23,027.80
1971
20,125.37
1972
58,032.38
1973
32,711.64
1974
34,679.52
1975
43,780.06
$212,356.77
Among the savings accounts petitioners maintained during the years here in issue were some certificates of deposits. When a certificate of deposit matured, Mr. Martin took the principal *178 amount of the account, added the interest amount that had accrued and at times additional cash from the business to the account, and established a new or renewed certificate of deposit. Petitioners received a summary report from FTD at the end of each month detailing the incoming and outgoing FTD sales for the month. The sales invoices retained by petitioners for the year 1975 totaled $407,462.22. Of that amount $284,369.71 showed payment by check (69.79 percent), $66,187.44 showed payment by cash (16.24 percent), and $56,919.27 showed payment by other methods, including credit card purchases and FTD purchases. During the years here in issue, petitioners made a number of substantial gifts to their children. In 1971, petitioners purchased an automobile for one of their sons for $2,753.04, which was paid by check drawn on the business account. In 1972, petitioners paid $4,737.60 for real estate purchased by one of their sons, also by check drawn on the partnership account. In 1972, they purchased an automobile for one of their daughters for $4,058.34. In 1974, petitioners paid a loan due for one of their sons in the amount of $1,563.58. In 1970, petitioners gave land with *179 a cost basis of $10,000 to one of their sons. During 1972, petitioners purchased a 25-foot Allmand boat for $11,434. This boat was registered in Mr. Martin's name. In 1974, petitioners purchased a 28-foot Allmand boat for $26,061.74. This boat was purchased by a series of cashier's checks drawn by Mr. Martin and payable to John Allmand Boat, Inc. This boat was also registered in Mr. Martin's name. The State of Mississippi tax auditor notified the Internal Revenue Service of the understatement of sales he had found when investigating the sales tax liability of Pugh's Floral Shop. After this notification, the original and amended returns of petitioners for the years 1973, 1974, and 1975 were assigned to a revenue agent in Biloxi, Mississippi, for examination. This agent was shortly to leave his employment with Internal Revenue Service. He called on petitioners at their place of business and commenced the examination. He was of the opinion that the understatement might have been caused by petitioners' failure to include in sales the amounts of wages paid in cash by the florist partnership. Because of the size of the understatement this agent found, he referred the case to *180 the Criminal Investigation Division of the Internal Revenue Service, although he had not completed his examination. A special agent of the Internal Revenue Service called upon Mr. Martin and after telling Mr. Martin of the right he had to remain silent and that any answers he gave might be used against him, asked Mr. Martin a series of questions. This was the first of a number of interviews the special agent had with Mr. Martin. When respondent's special agent interviewed Mr. Martin, Mr. Martin told the agent that he had determined sales of the floral business from bank deposits. He also told him he did not pay any creditors regularly in cash and said that except for the state sales tax, he could think of no purchases or transactions for which he had used cashier's checks. In this interview, Mr. Martin told respondent's agent that all checks drawn for personal expenses on the business bank accounts were marked "Prop." Mr. Martin did not tell respondent's agent about the two boats he had purchased when questioned about assets he had purchased. Mr. Martin did not tell the special agent about the gifts he had made to his children during the years here in issue when questioned about *181 gifts he had made. Mr. Martin was indicted and tried for violation of section 7201 for wilfully attempting to evade or defeat income tax for each of the years 1971 through 1975. At the conclusion of the presentation of evidence on behalf of the government, the court directed Mr. Martin's acquittal on all accounts. Respondent in his notice of deficiency, mailed to petitioners on April 3, 1981, determined petitioners' tax liability on a net worth plus personal expenditures basis. Respondent determined petitioners' taxable income to be in the following amounts for the years indicated: 1970
1971
1972
1973
1974
1975
$54,116.32
$42,076.36
$89,364.64
$40,500.23
$71,702.66
$117,120.70
Respondent also determined that petitioners were liable for the addition to tax under section 6653(b) for fraud. Respondent in an amendment to answer, alleged in the alternative that if the Court determined that the returns filed for each of the years here in issue were not false and fraudulent so as to remove the bar of the statute of limitations on the assessment of tax, the statute of limitations was open for the years 1974 and 1975 because there had been an *182 omission of more than 25 percent of gross income and the 6-year statute of limitations provided for by section 6501(e) had not expired at the time of the issuance of the notice of deficiency. OPINION Petitioners have conceded the computation of their tax liability by respondent under the net worth method except for the claim that the excise taxes which they paid after the investigation by the state tax auditor should be an adjustment to the income computed under the net worth method and respondent has conceded their right to such an adjustment. Petitioners' contention in this case is that no part of the underpayment of tax was due to fraud on the part of Mr. Martin, and that since the returns for each of the years here involved were not false or fraudulent the statute of limitations bars the assessment and collection of any tax. Petitioners also contend that respondent has failed to prove an understatement of gross income of more than 25 percent for the years 1974 and 1975 and, therefore, the 6-year statute of limitations under section 6501(e) is not applicable to these two years in the event the Court holds that the returns for those years were not fraudulent. In the alternative, *183 petitioners contend that if there is any deficiency in tax for any of the years here in issue which is not barred by the statute of limitations, Mrs. Martin should be relieved from such deficiency in tax as an innocent spouse under the provisions of section 6013(e)[2]. As both parties recognize, the burden of showing that part of the underpayment of tax by petitioners was due to fraud on the part of Mr. Martin and that petitioners' return for each year was false or fraudulent so as to lift the bar of the statute of limitations, is upon respondent. Respondent must establish the existence of such fraud by clear and convincing evidence. Marsellus v. Commissioner,544 F. 2d 883, 885 (5th Cir. 1977), *184 affirming a Memorandum Opinion of this Court. Ross Glove Co. v. Commissioner,60 T.C. 569, 608 (1973). The cases uniformly hold that the existence of a deficiency in tax standing alone is not sufficient to show fraud. Likewise, a failure by a taxpayer to report income or an understatement of income without more does not establish fraud. However, since fraud is a question of intention, it is rare that it can be shown by direct evidence but generally must be established by inferences drawn from the conduct of the taxpayer and all other facts and circumstances of record. Gajewski v. Commissioner,67 T.C. 181, 199-200 (1976), affirmed without published opinion 578 F. 2d 1383 (8th Cir. 1978). Fraud within the meaning of section 6653(b) and section 6501(c)(1) is an intentional wrongdoing with the intent to evade a tax known or believed to be owing. Webb v. Commissioner,394 F. 2d 366, 377-378 (5th Cir. 1968), affirming a Memorandum Opinion of this Court. Mitchell v. Commissioner,118 F. 2d 308 (5th Cir. 1941). *185 Fraud is not established merely by evidence which creates a suspicion. Even a strong suspicion is not sufficient to show fraud, but fraud must be established by evidence that is clear and convincing. Thurston v. Commissioner,28 T.C. 350 (1957). In a number of cases it has been held that consistent and substantial understatement of large amounts of taxable income over a period of years in and of itself is strong evidence of fraud. Merritt v. Commissioner,301 F. 2d 484 (5th Cir. 1962), affirming a Memorandum Opinion of this Court. Smith v. Commissioner,32 T.C. 985, 987 (1959). In Merritt v. Commissioner,supra at 487, the Court stated that: The mere understatement of income, standing alone, is not enough to carry the burden cast upon the Commissioner in seeking to recover fraud penalties. But each case is to be considered in the light of its own facts. Consistent and substantial understatement of income is by itself strong evidence of fraud. This proof, coupled with the showing that the records were both incomplete and inaccurate, and that the petitioner did not supply the bookkeeper with all of *186 the data necessary for maintaining complete and accurate records, is enough to warrant the Tax Court in finding fraud. Reaves v. Commissioner, 5th Cir. 1961, 295 F. 2d 336; Cefalu v. Commissioner,supra; Bryan v. Commissioner,supra.
Against the background of the above-stated principles, we must weight the evidence in this case. The record here shows a substantial understatement of income for each of the years involved. The understatements are substantial as to business receipts as well as income. The records show that while petitioners were showing income in amounts ranging from approximately $7,000 to $17,000 a year, including the interest income reported by them, they were depositing amounts in their bank accounts each year ranging from $23,000 to $58,000. Although Mr. Martin claims that the understatements of income were due to his poor bookkeeping ability, his poor health and his lack of formal education past the 11th grade, the record offers no explanation of how he could consider that more money could be added each year to his savings accounts than the total income he reported. The only rational conclusion from these facts is that Mr. *187 Martin knew of the underreporting of his income. Knowingly underreporting income on a tax return is in itself a strong indication of fraud. However, the record further shows that when Mr. Martin's attention was called by the State sales tax auditor to his substantial underreporting of sales receipts and the auditor suggested that amended returns be filed for 1973, 1974, and 1975, Mr. Martin filed amended returns using the adjusted bank deposits as determined by the State sales tax auditor, but increasing cost of goods sold and certain other deductions in two of the years to such an extent that no additional income but rather a decrease in income was reported. For the year in which income was increased, the total reported income was less than the amount added that year to petitioners' savings accounts. By the time these amended returns were filed, Mr. Martin's attention had been called to the understatements of receipts and he should have been alerted to the fact that his income was grossly understated by merely looking at the increases in his savings accounts. Mr. Martin was certainly aware *188 at this time that not all of his receipts were deposited in his bank accounts. However, he used as receipts the amounts computed by the State sales tax auditor from his bank deposits as his total gross receipts, thus attempting to conceal cash receipts. Mr. Martin was also aware at the time he filed the amended returns, of the boat he had purchased with cashier's checks for $26,000 in a year when he reported much less than that amount of income on both his original and amended returns. He was also aware of the gifts he had made to his children during the years here in issue. While it is the original return which must be fraudulent, Mr. Martin's actions with respect to the amended returns support an intent to defraud at the time the original returns were filed. The fact that adequate records were not kept to accurately reflect the income from Pugh's Floral Shop, standing alone, might indicate negligence rather than fraud. However, when this fact is coupled with a consistent understatement of receipts and income during a time when Mr. Martin knew that sales were increasing, it indicates fraud with intent to evade tax. Petitioners' dealings in cash, particularly payment of personal *189 expenses, wages and some purchases in cash, standing alone might not be sufficient to show fraud. However, large cash payments without adequate records of such payments is an indication of fraud. On the basis of this record as a whole, we conclude that respondent has established by clear and convincing evidence that some part of the underpayment of tax in each of the years here in issue was due to fraud on the part of Mr. Martin with intent to evade tax, and that the return for each of the years here in issue was false and fraudulent so that the statute of limitations does not bar the assessment and collection of the deficiencies. In arriving at our conclusion, we have not overlooked the testimony of the first revenue agent who began investigating petitioners' tax returns for the years 1973, 1974, and 1975. However, in our view that agent did not sufficiently investigate petitioners' tax liability for his opinion with respect to petitioners' intent in underreporting their income to be of any help to the Court. This agent apparently began his investigation with the amended and not the *190 original returns since he was of the opinion that the main reason for the understatement of income was failure to include in receipts cash used to pay wages. The entire testimony of this agent shows that he had not made sufficient investigation with respect to petitioners' tax liability to be able to have his testimony be of any value in the case. Likewise, we have not overlooked petitioners' testimony of reliance on a tax return preparer. The record shows that the return preparer prepared the returns from figures furnished to her by Mr. Martin. Mr. Martin was unable to satisfactorily explain how he believed the estimates he furnished to the return preparer might accurately state his receipts, income and deductions. The furnishing of such false information to the return preparer by Mr. Martin is in itself an indication of fraud. The remaining issue is whether Mrs. Martin should be afforded relief under section 6013(e). That section provides that a spouse may be relieved of liability for tax on *191 a joint return to the extent such liability is attributed to a substantial understatement of tax due to grossly erroneous items of the other spouse. To meet the criteria of this section, the spouse claiming the benefits of section 6013(e) must show that the omitted income was that of the other spouse, that she had no knowledge and no reason to have knowledge of the substantial understatement of the other spouse and that she did not significantly benefit from the underreporting of income. In addition to the above set out items, section 6013(e)(4)[3] provides that the liability for tax must exceed specified percentages of the spouse's adjusted gross income in the preadjustment year. It provides that if adjusted gross income in the preadjustment year of the spouse claiming the benefits of the section is $20,000 or less, the subsection applies only if the tax liability due to grossly erroneous items is greater than 10 percent of such adjusted gross income, and if the adjusted gross income of such spouse is more than $20,000 for the preadjustment year, the section shall be applied only if the tax liability exceeds 25 percent of such adjusted gross income. The preadjustment year is defined *192 to mean the most recent taxable year of the spouse ending before the date the deficiency notice was mailed. The record here shows that the notice of deficiency was mailed on April 3, 1981. This record contains no information as to Mrs. Martin's income for the preadjustment year which is the year 1980. For this reason alone, Mrs. Martin has failed to meet the burden of showing that section 6013(e) is applicable in her case. However, there are other reasons why the section is not applicable to Mrs. Martin. The record here shows that the Pugh's Floral Shop was a partnership owned equally by petitioner and Mrs. Martin. Therefore, one-half of the proper income of the business was Mrs. Martin's partnership income. Although because of respondent's concession, we held at the conclusion of the trial that respondent had failed to show fraud on the part of Mrs. Martin, this fact does not mean that the proper income of the floral shop was not one-half Mrs. Martin's income. For this reason Mrs. Martin has failed even to show that the omitted income was that of her husband only. Secondly, Mrs. Martin was aware of the gifts being made to her children and also of the deposits in the various *193 savings accounts. For this reason she certainly should have known that the income reported on her joint return with her husband was understated. Finally, Mrs. Martin profited from the omitted income since she owned at least some, if not all, of the various savings accounts and certificates of deposit jointly with her husband. Based on this record, we conclude that although Mrs. Martin is not liable for the addition to tax for fraud under section 6653(b) because of respondent's failure to show fraud on her part, she is not entitled to be relieved from the deficiencies under section 6013(e). *194 At the trial, respondent agreed that adjustments should be made in the net worth statements for the additional sales taxes determined against petitioners for the years 1973, 1974, and 1975. Because of this concession, Decision will be entered under Rule 155.
Footnotes
1. All references are to the Internal Revenue Code 1954↩, as amended unless otherwise indicated.
*. Incorrectly shown as wages, salaries, etc.↩
2. At the conclusion of the trial in this case, petitioners moved that the Court hold respondent had failed to establish fraud on the part of Mrs. Martin. Respondent conceded at that time that he had not established fraud on the part of Mrs. Martin and based on this concession the Court granted petitioners' motion and determined that there was no fraud shown in any of the years here in issue on the part of Mrs. Martin.↩
3. Section 6013(e)(4). (4) UNDERSTATEMENT MUST EXCEED SPECIFIED PERCENTAGE OF SPOUSE'S INCOME. -- (A) ADJUSTED GROSS INCOME OF $20,000 OR LESS. -- If the spouse's adjusted gross income for the preadjustment year is $20,000 or less, this subsection shall apply only if the liability described in paragraph (1) is greater than 10 percent of such adjusted gross income. (B) ADJUSTED GROSS INCOME OF MORE THAN $20,000. -- If the spouse's adjusted gross income for the preadjustment year is more than $20,000, subparagraph (A) shall be applied by substituting "25 percent" for "10 percent". (C) PREADJUSTMENT YEAR. -- For purposes of this paragraph, the term "preadjustment year" means the most recent taxable year of the spouse ending before the date the deficiency notice is mailed. (D) COMPUTATION OF SPOUSE'S ADJUSTED GROSS INCOME. -- If the spouse is married to another spouse at the close of the preadjustment year, the spouse's adjusted gross income shall include the income of the new spouse (whether or not they file a joint return). (E) EXCEPTION FOR OMISSIONS FROM GROSS INCOME. -- This paragraph shall not apply to any liability attributable to the omission of an item from gross income.↩